IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ANDREW JAMES DUBOIS                                                    PLAINTIFF


        V.                          Civil No. 2:23-cv-02050-PKH-MEF


MARTIN O'MALLEY, Commissioner,
Social Security Administration[1]                                      DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Andrew Dubois ("Dubois"), seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying Dubois's application for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq.* ("the Act"), pursuant to 42 U.S.C. § 405(g).  On judicial review, the Court must determine whether the administrative record contains substantial evidence to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.        Procedural History and Background

Dubois filed his application for supplemental security income ("SSI") on March 25, 2021, alleging disability beginning January 1, 2009, due to post-traumatic stress disorder ("PTSD"), social anxiety disorder, and depression.[2]  (ECF No. 9, pp. 13, 93, 201, 218-226).   The

---

[1] Martin O'Malley was sworn in as the Commissioner of the Social Security Administration on December 20, 2023, and was automatically substituted as a party.  *See* Fed. R. Civ. P. 25(d) (2023).

[2] Dubois previously filed applications for disability insurance benefits and for supplemental security income in Iowa, most recently on June 26, 2017.  (ECF No. 9, pp. 66, 93).   In these applications, Dubois alleged disability beginning February 1, 2009, due to "multiple mental health issues," including depression, and indicated his chief obstacle to working was that "he was essentially unable to get along with people and unable to do things on his own."  (*Id.*, p. 73).   The

Commissioner denied Dubois's current application at both the initial level of review and on reconsideration, and Dubois subsequently appeared with his representative, attorney Laura J. McKinnon, at a telephonic hearing before Administrative Law Judge Elisabeth McGee on May 24, 2022.  (*Id.*, pp. 13, 38–62, 90-122).  At the time of the hearing, Dubois was 47 years old and had limited education.[3]  (*Id.*, pp. 54, 90, 92).  He had past relevant work ("PRW") experience as a railroad car repair helper and as a hand packager.  (*Id.*, pp. 44–49, 205).

In an unfavorable decision dated June 7, 2022, the ALJ concluded that although Dubois's attention deficit hyperactivity disorder ("ADHD"), social anxiety, antisocial personality disorder, depression, and PTSD were severe impairments, he did not have an impairment or combination of impairments that met or medically equaled the severity criteria for presumptive disability under the Listing of Impairments.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  (ECF No. 9, pp. 16-17).  After considering all of Dubois's symptoms, as well as the medical and other evidence, the ALJ determined that Dubois retained the functional capacity to perform a full range of work at all exertional levels and could respond to usual work situations and routine work changes, but could understand, remember, and carry out only simple, routine, repetitive tasks; respond to supervision that is simple, direct, and concrete; and occasionally interact with coworkers and the general public.  (ECF No. 9, p. 18).  Considering the testimony of a vocational expert, the ALJ found Dubois could perform his past relevant work as a hand packager and that, in addition, there were

---

applications were denied at the hearing level on January 25, 2019, and are *res judicata* for the period adjudicated.  (*Id.* at 63-78, 84, 93).  *See* 20 C.F.R. § 416.1455(a) (providing the ALJ's decision is final and binding where the appeals counsel declines a party's request for review).  *See also Robbins v. Sec'y of Health and Hum. Servs.*, 895 F.2d 1223, 1224 (8th Cir. 1990) (per curiam) (holding principles of *res judicata* apply to social security proceedings).

[3] Dubois reported that he was sent to prison while in the 10th grade and did not thereafter obtain his GED.  (ECF No. 9, pp. 34, 54).

jobs existing in significant numbers in the national economy that he could perform, including work as a kitchen helper, price marker, and housekeeper.  (*Id.*, pp. 23-24).

On February 8, 2023, after considering additional evidence submitted by Dubois, the Appeals Council denied his request for review.  (ECF No. 9, pp. 1-9).  This timely action for judicial review followed.  (ECF No. 3).  The parties have fully briefed the issues (ECF Nos. 11, 13), which are before the undersigned for report and recommendation.

## II.    Applicable Law

Under 42 U.S.C. § 405(g), this Court must determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  This evidentiary threshold is not high; it is more than a mere scintilla and requires only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019), *cited in Ross v. O'Malley*, 92 F.4th 775, 778 (8th Cir. 2024).  The Court considers both evidence that detracts from the decision and evidence that supports it.  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011).  If the ALJ's decision is supported by substantial evidence on the record as a whole, this Court must affirm even if substantial evidence also exists for the opposite decision.  *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

A claimant for Social Security disability benefits bears the initial burden of proving his disability.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A).  To meet this burden, he must establish his "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  The Act defines "physical or mental impairment" as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

To determine whether a claimant is disabled, the Commissioner's regulations require the application of a five-step sequential evaluation process, considering: (1) whether the claimant has engaged in substantial gainful activity since filing the claim; (2) whether he has a severe physical or mental impairment or combination of impairments; (3) whether any impairments meet or equal a listed impairment; (4) whether the claimant's limitations prevent him from performing his PRW; and, if so, (5) whether he is able to perform other work in the national economy given his age, education, and experience.  20 C.F.R. § 416.920(a)(4).  If the claim is not resolved at steps one through four, the fact finder will consider the claimant's age, education, and work experience in the light of his residual functional capacity to determine, at step five, whether he can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).

### III.    Relevant Medical Evidence

As an initial matter, it is important to note that the relevant period of disability under review in this case is limited.  Dubois's previous claims for DIB and SSI—both denied on January 25, 2019—were ineligible for reopening by the time he filed the present claim for SSI on March 25, 2021.  *See* 20 C.F.R. § 416.1488 (authorizing reopening within one year of the initial notice of decision for any reason, within two years for good cause, and, beyond that, only for fraud).  Further, SSI benefits are not payable for any period of disability that precedes a claimant's application date, and eligibility requires a showing of continuous disability during the pendency of the application.  *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§ 416.330(a), 416.335; *Jernigan v. Sullivan*, 948 F.2d 1070, 1072 n.3 (8th Cir. 1991) (stating to be eligible for SSI benefits, "claimant must show he was under a continuing disability while his application was pending").  Consequently, the relevant

period of alleged disability under consideration here is from the application date of March 25, 2021, to the date of the ALJ's decision on June 7, 2022.  Further, the 2019 determination that Dubois was not disabled is *res judicata* for the adjudicated period of February 1, 2009, through January 25, 2019; therefore, the medical evidence considered in that proceeding could not be reevaluated by the ALJ here but could serve only "as a background for new and additional evidence of deteriorating mental or physical conditions" existing between March 25, 2021, and June 7, 2022. *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 364-65 (8th Cir. 2007) (quotation omitted). *See also Cox v. Barnhart*, 471 F.3d 901, 907 (8th Cir. 2006) (holding medical evidence dated outside the relevant period may only be used to elucidate a medical condition existing during the time for which benefits might be awarded).

The medical evidence in the record reflects that, prior to the relevant period, Dubois presented for treatment at River Valley Primary Care on December 2, 2019, and on June 4, 2020. (ECF No. 9, pp. 348-366).  On each visit, Dubois was noted to be alert and fully oriented, with normal mood, affect, and behavior.  (*Id.*, pp. 350, 355-356).  On December 2, 2019, he complained of recent fever, chills, and cough, and Nurse Practitioner Ashley Gattis diagnosed an upper respiratory infection and advised Dubois to use over-the-counter medication for symptom management.   During this visit, Dubois also reported a history of hiatal hernia and gastroesophageal reflux disease, for which Nurse Gattis filled a prescription for omeprazole.  (*Id.*, pp. 353-357).

On June 4, 2020, Dubois presented for a refill of omeprazole and also complained of what he believed was a diverticulitis flare.  He explained that he had previously been assessed with diverticulitis in Iowa and had successfully treated it with levofloxacin and flagyl.  (ECF No. 9, p. 348).   Nurse Gattis diagnosed diverticulitis, acute diarrhea, and lower abdominal pain; she

prescribed levofloxacin and flagyl, refilled Dubois's omeprazole prescription, and ordered routine labs. (*Id.*, pp. 351-352). Lab results showed slightly elevated triglycerides, for which Nurse Gattis gave dietary advice to cut back on fatty food. (*Id.*, p. 364).

Dubois next presented for an initial mental-health intake at River Valley Counseling and Therapy on February 11, 2021, the month before filing his SSI application. (ECF No. 9, pp. 308-319). He saw Licensed Professional Counselor, Dana Thomason, Ph.D., and stated that his reason for seeking counseling was a lifelong inability to "deal with people," which he said prevented him from working. (*Id.*, p. 311). Dubois expressed uncertainty about what he hoped to gain from counseling, other than the "need to get SSI." (*Id.*, p. 318). He indicated he had worked mostly "labor type jobs" and would "get frustrated and ... make people mad," and was currently unemployed because he was "fired or laid off." (*Id.*, p. 316). In his treatment record for this encounter, Dr. Thomason noted Dubois's symptoms of anger, anxiety, depression, and stress, but did not indicate hallucinations, delusions, trauma, mental confusion, or difficulties with attention, concentration, or coping. (*Id.*). He further noted Dubois was fully oriented, exhibited a congruent mood, and normal thought content and perception, but he was distractible and showed poor insight or judgment. (*Id.*, p. 319). Dubois rated the intensity of his problem as 8 out of 10, described his physical health as "good," and indicated the only medication he took was omeprazole. (*Id.*, pp. 311, 317). He reported a ninth-grade education, that he did not get a GED, and that he had been in "learning disability classes all the time." (*Id.*, p. 316). Dr. Thomason initially diagnosed social anxiety disorder, rule-out ADHD, and rule-out any "psychotic" based on Dubois's statement that he had once been diagnosed with "schizophrenia" when he was young. (*Id.*, p. 319).

On February 23, 2021, Dr. Thomason completed an "interpretation of diagnosis," in which he recapitulated his February 11 encounter with Dubois, added more details about Dubois's

complaints on that date, and revised his diagnosis.  Dr. Thomason indicated that Dubois had reported problems with sleep, procrastination, difficulty completing tasks, lack of motivation, problems with concentration, memory, and intrusive thoughts.  Dubois further indicated he had "anger problems and acts impulsively[,]" is socially avoidant, and "cannot hold a job" because "he just can't stand being around people and will either quit or get fired."  (*Id.*, p. 331).  He said that when growing up he was always getting into trouble and was in special education classes, and he had legal problems as a juvenile and adult.  Dr. Thomason diagnosed social anxiety disorder and advised Dubois to talk to his primary care provider about starting prescription medication, but he deferred making any other diagnoses.  He stated he believed that a learning disability and personality disorder, possibly schizoid personality disorder, also were present, but he did not diagnose either impairment, stating he needed to do more assessment.  (*Id.*).

Dubois filed his SSI application the following month, on March 25, 2021, and Dr. Thomason subsequently prepared a letter that was provided to agency disability specialists at the administrative level of review.  (ECF No. 9, pp. 95, 97, 98, 111, 308-309, 370-371).  The letter is dated April 6, 2021, and it reiterates Dubois's reported history and symptoms as recounted in Dr. Thomason's February 2021 records.  (*Id.*, pp. 308, 370).  In the letter, Dr. Thomason also stated that, based on the information Dubois provided at their first encounter in February, "it seemed that a diagnosis of F 40.10 Social Anxiety Disorder and F 90.9 Unspecified Attention-Deficit-Hyperactivity Disorder is probably [the] most appropriate diagnosis, along with some depression." (*Id.*).  He added that at their "second session," Dubois revealed that he had suffered verbal and slight physical abuse by his mother when he was a child, that he had "spent approximately six years in prison as an adult," and "indicated that this was a very traumatic experience for him." (*Id.*).  Based on this information, Dr. Thomason diagnosed Dubois with PTSD and stated that he

"believe[d] it would be virtually impossible for [Dubois] to be able to function in a job setting." (*Id.*, pp. 309, 371).  He reiterated that Dubois had been encouraged to talk with his primary care physician about starting medication.  (*Id.*).

On June 1, 2021, Dr. Don Ott conducted a consultative mental exam.  (ECF No. 9, pp. 320-327).  Dubois described an irritable and depressed mood, difficulty sleeping, stated he gets anxious around other people, cannot get along with them, and that he had been fired or laid off from every job he has had.  He indicated he had seen therapists beginning around school age and said he was taking a medication for anxiety and depression, but he could not remember its name or the full name of the prescribing physician, identifying him only as "Dr. Dana."  (*Id.*, p. 322).  Dubois reported verbal and physical abuse by his mother, stating she hated him "because of how he is" and stating that he had "a lot of behavioral problems in school" and quit school after ninth grade.  Dr. Ott noted Dubois had been convicted of assault and possession of a concealed weapon and spent about six years in prison before he was released in 2005.  (*Id.*, p. 322).  He indicated he had abused "street drugs" between the ages of 16 and 36, still occasionally smoked marijuana, abused alcohol since age 12, and currently drinks beer two or three times a week.  (*Id.*, p. 323).  Dr. Ott noted Dubois's ability to relate was appropriate, and he was generally pleasant and cooperative during the structured interview, exhibited no aggression, but seemed tense and "uptight." Additionally, he looked stern, defensive, and accusatory, with intense eye contact, but exhibited a satisfactory range of affect.  He was alert, fully oriented, with no loss of contact with reality, no pressured speech, or loosened associations; his thoughts were rational, coherent, and goal-directed, with no evidence of delusions, bizarre thinking, or auditory or visual hallucinations, but he reported sometimes hearing people whispering, as if they were talking about him.  (*Id.*, p. 323).  He could recall his date of birth, phone number, and social security number, and digit-span testing showed

auditory recall of five items forward and three items backward, and the ability to recall three out of three unrelated items, including their names and colors, after five minutes.  (*Id.*, p. 324).  Dubois had a vehicle, but his driver's license was suspended in 2013, and he did not want to study for the test again.  He reported that his wife receives disability, manages the household finances, and does most of the housework.  He reported no major conflict with other people and indicated that he had social contact about once a week.  (*Id.*, p. 325, 326).  Dr. Ott noted Dubois had a limited vocabulary and fund of information, but his verbal skills were adequate, although he used a lot of vulgar, abusive language, as if others were responsible for all his problems.  (*Id.*, pp. 323, 325-326).  He seemed unable to focus effectively and had poor math skills but exhibited no specific limitations in persistence or pace.  (*Id.*, pp. 325, 326).  Noting Dubois's difficulty in school and limited work experience, Dr. Ott stated Dubois's capacity to cope with the mental demands of work was deficient.  (*Id.*, p. 326).  Based on Dubois's history, symptoms, and presentation, Dr. Ott assessed antisocial personality disorder, rule-out borderline intellectual functioning, and rule-out dependent personality disorder.  (*Id.*, p. 324, 325).

Almost seven months later, on December 28, 2021, Dubois returned to River Valley Primary Care.  (ECF No. 9, pp. 344-347).  He reported ongoing issues with depression, anxiety, and sleep, and he sought a prescription for citalopram (Celexa), stating that he was supposed to begin taking it nine months earlier, in March, but had not done so.  He also indicated he had gained weight, and wanted to be tested for thyroid issues, and said he had recently had a colonoscopy and EGD.  Nurse Gattis diagnosed a mild episode of recurrent major depressive disorder and anxiety, and she filled prescriptions for citalopram (Celexa) and omeprazole (Prilosec).  (*Id.*, pp. 19, 347).  She further ordered lab testing, the results of which indicated a normal level of thyroid stimulating hormone, slightly elevated glucose, and elevated cholesterol and triglycerides.  (*Id.*, pp. 344, 359-

363).   She diagnosed elevated glucose and hyperlipidemia, recommended that Dubois return for pre-diabetes screening with an A1C test, prescribed medication for elevated lipids, and advised him to limit fatty foods and increase fruits and vegetables.  (*Id.*).

On March 8, 2022, Dubois presented at Summit Reach Counseling & Psychotherapy, where he saw Dr. Thomason.  (ECF No. 9, pp. 373-375).   Dubois reported that his chief concern was anxiety.   His mood was noted to be apathetic, and he reported that dealing with his attorney to get his disability "ha[d] him really stressed."  (*Id.*, p. 373).   His attitude toward therapy was noted to be "passive," and he was said to be taking his medication, which he thought was Celexa, as prescribed.  (*Id.*).   He was fully oriented, with normal eye contact, speech flow, and appropriate affect.  (*Id.*, p. 374).   Dr. Thomason noted Dubois's history of anxiety and depression and stated that his current problem was difficulty sleeping and extreme worry "because he doesn't know how he will make it if he doesn't get his disability."  (*Id.*, p. 375).   Dr. Thomason again diagnosed PTSD, with related symptoms of anxiety, anger, and depression.  (*Id.*, pp. 374-375).   He proposed cognitive behavioral therapy, with the goal of reducing symptoms associated with PTSD in six months, and he indicated this treatment was started and partially addressed in this session.   He noted Dubois was to continue to see his primary care provider for medication management and that his overall prognosis was fair.  (*Id.*, p. 375).

On March 29, 2022, Dubois again presented to Dr. Thomason, who noted Dubois's insight, judgment, behavior, affect, speech, and thoughts were within normal limits; that he was taking his medication as prescribed; his progress was stable, and his prognosis fair.  (ECF No. 9, p. 32).   Dr. Thomason noted that Dubois was apathetic and reported he was "still depressed and isolating most of the time."  (*Id.*).   His PTSD diagnosis remained unchanged, and Dr. Thomason indicated that he and Dubois had worked on "reframing the negative self-talk," and that Dubois would "also

work on finding things to keep his mind occupied and work with his hands rather than just sitting around and doing nothing." (*Id.*).  He proposed that they meet again in approximately three weeks. (*Id.*).

## IV.    Discussion

Dubois presents four issues for review: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at step two of the sequential analysis; (3) whether the ALJ properly evaluated Dubois's subjective complaints; and (4) whether substantial evidence supports the ALJ's RFC determination.  Following a thorough review of the evidence in the record as a whole, the undersigned finds that substantial evidence supports the ALJ's decision to deny benefits in this case.

### A.    Duty to Develop the Record

In his first argument, Dubois insists that remand is required for further development of the record with respect to his mental RFC. [4]  (ECF No. 9, pp. 5-10)  Specifically, he contends the ALJ failed to account for mental impairments found in the prior decision denying benefits in Iowa and should have exhibited the medical evidence considered in that decision.  He further suggests that a repeat consultative examination was necessary because the ALJ rejected the only opinion evidence from Dubois's treating source, Dr. Thomason, and instead relied on that of consulting

---

[4] Dubois also makes a passing reference to a request for a physical consultative examination made in a prehearing memorandum filed two days before the hearing.  (ECF No. 11, p. 6) (citing ECF No. 9, p. 296).  He suggests that this request was implicitly denied when the ALJ issued her decision; however, he develops no argument that the ALJ erred by denying this request, and he appears to concede he demonstrated no severe physical impairments.  (ECF No. 11, pp. 6, 14, 15).  Under the settled rule that "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived[,]" the Court will not do counsel's work. *See Binns v. Astrue*, No.  2009 WL 564451, at 4 (E.D. Ark. Mar. 5,  2009) (quotation omitted). "Judges are not expected to be mind[]readers.  Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."  *Id.* (quotation omitted).

examiner, Dr. Ott. The ALJ must ensure the development of a record that is adequate to allow an informed decision about whether the claimant is disabled. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004). Nevertheless, the burden of persuasion to prove disability and to demonstrate RFC remains on the claimant throughout the sequential evaluation process. *Stormo*, 377 F.3d at 806; *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987) (noting that the claimant is in a better position to provide information about his own medical condition). Thus, in dispatching her duty to ensure a reasonably complete record, it is not the ALJ's role to "function as the claimant's substitute counsel" and prove disability. *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014); *see also Richardson v. Perales*, 402 U.S. 389, 410 (1971) (hearing examiner does not act as counsel but as examiner charged with developing facts). Her role is non-adversarial, and as long as the record contains sufficient evidence for the ALJ to make an informed decision about whether the claimant is disabled, she need not recontact a treating or consulting medical source and is not required to order additional medical examinations or tests, or otherwise obtain additional medical evidence. *See Stormo*, 377 F.3d at 806 (noting non-adversarial nature of disability proceedings requires ALJ to ensure neutral development of facts, but this duty does not require additional evidence unless crucial issue is undeveloped and evidence is not sufficient to determine whether claimant is disabled); *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (same).

In the present case, the record contained sufficient evidence for the ALJ to determine Dubois's mental RFC without requiring additional evaluation, testing, or records. The record documents Dubois's underlying mental-health conditions with medical records from his primary-care provider and his mental-health counselor spanning dates from December 2019 through March 2022. (ECF No. 9, pp. 307-376). Although Dubois's pursuit of treatment from these providers was sparse, the records document the formal medical and mental-health treatment he sought during

the relevant period for depression, anxiety, PTSD, and anger problems; his related, underlying history of special education and ADHD; and his treatment for various benign physical ailments. (*Id.*).  Further, Dubois provided function, pain, and other informative reports, and he testified about the disabling nature of his mental-health conditions.   (*Id.*, pp. 50-58, 239-250, 281-283). Additionally, Dr. Ott performed a consultative examination that included a mental diagnostic evaluation with an assessment of the effects of Dubois's mental impairments on his adaptive functioning.  (*Id.*, pp. 320-327).  The record also contains the assessments of two non-examining agency doctors, who not only reviewed Dubois's then-current records and Dr. Ott's report, but also considered the evidence underpinning the prior case in Iowa, as it was discussed in the prior decision.  (ECF No. 9, pp. 93, 98-99, 110).  The undersigned finds that the evidence in the present record is sufficient on the whole to support the ALJ's determination that Dubois's mental afflictions do not prevent him from working at some jobs.  *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) (holding ALJ is permitted to issue decision without obtaining additional medical evidence where other evidence in record provides sufficient basis for decision).

In support of his argument for remand, Dubois relies on the prior adverse decision from Iowa, noting that it contains step-two findings of schizoaffective disorder, bipolar disorder, and a history of math disorder and learning disorder, which the ALJ here did not find.  (ECF No. 11, p. 6).  Dubois asserts that because the ALJ here did not exhibit the medical evidence considered in the prior decision, she erroneously omitted these impairments at step two.  (*Id.*).  This argument improperly shifts the burden of persuasion and production to the ALJ, which, as noted, goes beyond her duty of neutral factual development.  At step two, a claimant bears the burden to demonstrate the existence of an impairment or combination of impairments that "significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  While

step two requires only "de minimis" proof of impairment, the claimant must show more than the mere presence of a condition or ailment. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

Here, we find no evidence that Dubois alleged these impairments in his application for SSI or at the administrative hearing, nor did he include them when listing his current impairments in his prehearing brief. (ECF No. 9, pp. 40-62, 221-226, 295). Further, the record contains no objective medical evidence that Dubois was diagnosed with, or sought treatment for, bipolar disorder, schizoaffective disorder, or math/learning disorders during the relevant period. *See Marolf v. Sullivan*, 981 F.2d 976, 978 (8th Cir. 1992) (proof of a disabling impairment must be supported by at least some medical evidence). Although Dubois asserts that Dr. Thomason "referenced schizoaffective disorder" in his "narrative" on February 23, 2021, this is not an accurate account of the record. (ECF No. 11, p. 11). In his February 23 narrative, Dr. Thomason noted the possibility that Dubois might have a personality disorder, such as schizoid personality disorder, not a psychotic disorder, such as schizoaffective disorder.[5] (ECF No. 9, pp. 331). Dr. Thomason made no mention of schizoaffective disorder, and he expressly declined to diagnose any personality disorder in his February 23 narrative; his later records reflect that he ultimately diagnosed only PTSD with the associated symptoms of anxiety, depression, and anger, as well as unspecified ADHD. (*Id.*, pp. 308, 331, 374-375). Absent any medical evidence documenting treatment for bipolar disorder, schizoaffective disorder, or math/learning disorders during the

---

[5] These disorders are distinct. As its name suggests, schizoid personality disorder is categorized with personality and impulse-control disorders under Listing 12.08. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00B7, 12.08. These disorders are characterized by enduring, inflexible, maladaptive patterns of behavior, including distrust, social avoidance, hypersensitivity to negative evaluation, excessive need to be taken care of, and inappropriate, intense, impulsive anger. *Id.* Schizoaffective disorder, on the other hand, is categorized with psychotic disorders under Listing 12.03, which require medical documentation of delusions or hallucinations, disorganized thinking (speech), or grossly disorganized behavior or catatonia. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00B2, 12.03.

relevant period, and a showing that they more than minimally impacted Dubois's ability to work during this period, the ALJ had no duty to obtain the records underpinning the decision involving a different time period before making her decision.  *Cf. Robbins*, 895 F.2d at 1224 (although it may provide relevant background for new evidence of disabling impairment, a claimant may not use evidence from a prior proceeding that is *res judicata* to prove a disabling condition in a subsequent period where his new evidence does not itself demonstrate a disabling change in his condition); *see also Eller v. Colvin*, No. 1:14CV34-BD, 2015 WL 2250046, at 2 (E.D. Ark. May 13, 2015) (holding principles of *res judicata* precluded reevaluation of opinion evidence that was considered in prior decision finding claimant was not disabled); *Owen v. Colvin*, No. 13-3113, 2015 WL 672564, at 4 (W.D. Ark. Feb. 17, 2015) (same).

Further, to the extent that Dubois considered the medical records evaluated during the prior period to be of significance to his claim, the record does not reflect that he or his counsel made any effort or encountered any difficulty in obtaining them from Dubois's treatment providers in Iowa or required the ALJ's assistance to do so.  In prehearing correspondence and a prehearing brief filed two days before the hearing, counsel identified medical evidence that was still outstanding, but that evidence did not include the evidence from Dubois's prior treatment providers in Iowa.  (ECF No. 9, pp. 291, 301).  And when asked by the ALJ at the hearing whether "we have all of the outstanding records," Dubois's counsel confirmed that all her requests for records had been satisfied, and without expressly requesting, much less mentioning, the evidence from the prior case, she agreed that the record could be closed.[6]  (*Id*., pp. 42, 61-62).

---

[6] Counsel either misstates or mischaracterizes the record when she states that she "expressly requested" the evidence in Dubois's prehearing brief and when she suggests that the ALJ affirmatively denied this request by her "exclusion" of the evidence.  (ECF No. 11, p. 6).  As noted, counsel made no express request for the evidence at the hearing, nor did she do so in her prehearing

Additionally, the prior decision on which Dubois relies, which is exhibited in the current record, contains an extensive discussion of the medical evidence underpinning it and gives no indication that the evidence had any likelihood of yielding a different result in the ALJ's decision here.  (ECF No. 9, pp. 66-83).  According to the prior decision, the previously considered evidence reflects Dubois's less-than-consistent pursuit of mental-health treatment for substantial periods between 2011 and 2017; the conservative nature of his treatment, with no emergency-room visits, involuntary admissions, or escalating symptoms; as well as his non-compliance with medication; the beneficial results of medication when he was compliant; his declination of anger-management therapy; and his lack of candor concerning his continued use of alcohol throughout the previously adjudicated period.  (*Id*., pp. 74-75).  It further reflects that standardized intelligence testing performed between 1975, 1983, and 1986 placed his full-scale IQ score anywhere from 85 to 93, and medical chart notes indicated his intelligence appeared average.  (*Id*., p. 70).  Under the circumstances, we cannot say the absence of these records prejudiced Dubois's case.  *See Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (prejudice is shown only where the evidence the ALJ failed to obtain would have made a difference in the case); *see also Combs v. Astrue*, 243 F. App'x 200, 204 (8th Cir. 2007) (per curiam) (stating claimant "bears a heavy burden in showing the record has been inadequately developed [and] must show both a failure to develop necessary evidence and unfairness or prejudice from that failure"); *Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001) ("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial") (quotations and citations omitted).

Relatedly, the ALJ was not required to order a repeat consultative examination with records

---

brief, which merely "note[d]" a "belie[f]" that "proper development includes ... exhibiting of 1F through 6F from the prior electronic file[.]"  (*Id*.)

review, additional testing, and an RFC assessment.  Assessment of a claimant's RFC is reserved to the agency and is neither delegated to medical professionals nor determined exclusively by medical records.  *See Combs v. Berryville*, 878 F.3d 642, 646 (8th Cir. 2017) (RFC is based on all relevant evidence, including medical records, observations of treating sources and others, and the claimant's descriptions of his limitations).  That Dr. Ott did not review medical records or conduct psychometric and academic-achievement testing when performing Dubois's mental diagnostic evaluation did not preclude the ALJ from relying on Dr. Ott's findings relevant to Dubois's impairments and functional abilities and limitations.  *See Stormo*, 377 F.3d at 806 (ALJ did not fail to fully develop the record where no crucial issue was undeveloped and examining medical sources provided clinical data and observations about claimant's limitations).  While additional testing, records review, and assessments might have had some utility, "[t]he ALJ is required to order medical examinations and tests only if the medical records presented … do not give sufficient medical evidence to determine whether the claimant is disabled."  *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir. 2010).  Nor was it necessary for Dr. Ott or any other examiner to complete an RFC assessment form, as "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  And a consultative examining physician is not required to review all medical records for his or her opinion to be entitled to substantial weight.  *Jones v. Colvin*, No. C14-3049-MWB, 2015 WL 6561387 at 5 (N.D. Iowa Oct. 30, 2015) (citing *Cook v. Astrue,* 629 F.Supp.2d 925, 932-33 (W.D. Mo. 2009)); *see also Carter v. Astrue,* 886 F.Supp.2d 1093, 1111 (N.D. Iowa 2012) (holding that the "ALJ was also entitled to assign significant weight to the opinions from the state agency medical consultants despite the fact that they did not review all the medical records").  Here, Dr. Ott appropriately noted that he did not have records of mental-health treatment for Dubois, identified the testing

17

done during his structured interview, and certified that the evaluation was a generally valid and reliable assessment of Dubois's current level of functioning. (ECF. No. 9, pp. 320, 327). Further, there is no indication Dubois experienced a decline in his condition that might have necessitated another examination following Dr. Ott's evaluation. *See* 20 C.F.R. § 416.919a(b)(4) (noting change in condition may warrant consultative examination if it is likely to affect ability to work and severity of impairment has not been established). Thus, when formulating Dubois's mental RFC, the ALJ properly considered Dr. Ott's examination findings along with all the other relevant evidence in the record, and a second consultative examination was not necessary.

### B.      Step Two

Dubois next argues that the ALJ improperly dismissed schizoaffective disorder and borderline intellectual functioning as non-severe impairments at step two. As noted, it is the claimant's burden at this step to establish a medically determinable impairment or combination of impairments that is severe. *Kirby*, 500 F.3d at 707. This severity showing "is not an onerous requirement for the claimant to meet, but it is also not a toothless standard." *Id.* at 708 (citation omitted). An impairment or combination of impairments is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c). Such an impairment "must be established by objective medical evidence from an acceptable medical source." 20 C.F.R. § 416.921. "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Kirby*, 500 F.3d at 707. After careful review of the entire record, the undersigned finds no reversible error in the ALJ's step-two analysis.

As previously noted, schizoaffective disorder is a psychotic disorder. Psychotic disorders are characterized by delusions or hallucinations, disorganized thinking (speech), or grossly

disorganized behavior or catatonia.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00B2, 12.03. Dubois did not allege that he suffered from schizoaffective disorder during the relevant period, and the record contains no objective medical evidence that he did so.  (ECF No. 9, pp. 32-36, 40-62, 221-226, 295, 306-376).  The record does reflect that he initiated mental-health counseling with Dr. Thomason in February 2021, citing his history and symptoms of depression, social anxiety, anger, and stress, which he asserted prevented him from working due to an "inability to be around others."  (*Id.*, pp. 311, 316).  However, Dr. Thomason ultimately diagnosed PTSD, with the associated symptoms of anxiety, depression, and anger, as well as unspecified ADHD.  (*Id.*, pp. 308, 331, 374-375).  His records document no delusions, and they note Dubois's congruent mood, normal thoughts and perceptions with no hallucinations, full orientation, and appropriate affect, normal eye contact, and responsive facial expressions.  (*Id.*, pp. 33-34, 311, 319).  This evidence aligns with Dr. Ott's findings that Dubois's ability to relate was appropriate during his evaluation in June 2021.  Dubois was described as generally pleasant and cooperative, fully oriented, neither exhibiting nor reporting symptoms of a thought disorder, and there was no evidence that he suffered from delusions, bizarre thinking, or auditory or visual hallucinations.  (*Id.*, p. 323-324).

Further, Dubois's counselor, Dr. Thomason, recommended only conservative treatment consisting of acceptance and commitment therapy as well as cognitive behavioral therapy, and he advised Dubois to obtain prescription medication for depression and anxiety from his primary care practitioner.  (ECF No. 9, pp. 35-36, 309, 331, 371, 375).  Absent any medical evidence documenting treatment for schizoaffective disorder during the relevant period, the undersigned finds the ALJ did not err by failing to identify schizoaffective disorder as a severe impairment in her step-two findings.  *See* 20 C.F.R. § 416.921 (an impairment "must be established by objective

19

medical evidence from an acceptable medical source"); *see also Marolf*, 981 F.2d at 978 (proof of a disabling impairment must be supported by at least some medical evidence).

Furthermore, and in the alternative, Dubois develops no meaningful argument that he was prejudiced by the omission of this impairment at step two.  (ECF No. 11, p. 11-12).  He makes only a passing reference to the relevant Listing—Listing 12.03—stating that the ALJ did not consider it in her severity analysis, but Dubois does not contend that he satisfied its criteria.  (*Id.*). As discussed above, the medical evidence of record shows no delusions, hallucinations, or catatonia, as required to satisfy the medical criteria of the Listing.  Further, the ALJ found that Dubois suffered from several severe mental impairments at the step-two threshold and performed the psychiatric review technique, considering all of the medical evidence and all of Dubois's impairments, severe and non-severe, at step three.  (ECF No. 9, pp. 16-18).  Listings 12.04, 12.06, and 12.15 were among those the ALJ considered, and each of these Listings utilize the same paragraph B and paragraph C criteria as Listing 12.03; therefore, they entail the same analysis. (*Id.*, p. 17).  *Compare* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04, 12.06, and 12.15, *with id.*, 12.03. The ALJ found Dubois did not satisfy these criteria, and Dubois makes no argument to the contrary. (ECF No. 9, pp. 17-18; ECF No. 11, pp. 11-12).  Thus, there would be no harm from a failure to address Listing 12.03, had the ALJ been obligated to do so.  *See Mark v. O'Malley*, 2024 WL 340736, at 6-7 & n.3 (E.D. Mo. Jan. 30, 2024) (noting failure to find an impairment severe at step two may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe); *Summers v. Kijakazi*, No. 4:21-CV-1390-ACL, 2023 WL 2707442, at 6 (E.D. Mo. Mar. 30, 2023) (same); *Gibbs v. Kijakazi*, No. 4:21-CV-00127-KGB, 2022 WL 4299732, at 1-2 (E.D. Ark. Sept. 19, 2022) (same).

Dubois also cursorily asserts that the ALJ omitted borderline intellectual functioning from the list of impairments that she found at step two and contends that this omission constitutes reversible error under *Nicola v. Astrue*, 480 F.3d 885, 887 (8th Cir. 2007).  (ECF No. 11, p. 12).  In *Nicola*, the ALJ's step-two findings included the claimant's numerous physical conditions, but no mental conditions, despite the fact that the claimant had alleged borderline intellectual functioning as a severe impairment.  480 F.3d at 886-887.  The medical records further established that the claimant's intellectual functioning was in the range associated with borderline intellectual functioning, yet the ALJ considered no mental impairments and included no psychiatric review technique analysis in her adverse decision.  *Id.*  On appeal, the Eighth Circuit rejected the Commissioner's assertion that the omission at step two had been harmless, reasoning that "no psychiatric review technique analysis [was] included in the ALJ's decision; nor [was] there evidence of the technique being conducted or documented at the other levels of the application process."  *Id.* at 887.  That is not the case here.

Dubois did not allege borderline intellectual functioning as a severe impairment in his SSI application or at the hearing; however, Dr. Ott assessed rule-out borderline intellectual functioning based on his examination of Dubois in June 2021, and Dubois subsequently listed it as an impairment in his prehearing brief.[7]  (ECF No. 9, p. 295, 324).  In contrast with the facts in *Nicola*, the record here reflects that Dr. Ott's assessment of borderline intellectual functioning was considered at the administrative levels of review by both Dr. Christal Janssen and Dr. Laurie Clemons, and each of them performed a psychiatric review technique analysis and confirmed RFC assessments finding Dubois capable of performing unskilled work, with Dr. Clemons additionally

---

[7] "Rule out" in a medical record means that the disorder is suspected, but not confirmed.  *Byes v. Astrue*, 687 F.3d 913, 916 n.3 (8th Cir. 2012) (quotation omitted).

limiting interpersonal contact and providing for supervision that is simple, direct, and concrete. (ECF No. 9, pp. 97-99, 109-115). Although Dr. Janssen did not include borderline intellectual functioning as a severe impairment, she evaluated the relevant listing for it, Listing 12.11. (*Id.*, pp. 97-98). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12:00B9(c), 12.11 (stating borderline intellectual impairment is evaluated under Listing 12.11); *see also Revised Medical Criteria for Evaluating Mental Disorders*, 81 FR 66138-01, at 66155, 2016 WL 5341732 (Sept. 26, 2016).

Additionally, and in contrast with *Nicola*, despite not mentioning borderline intellectual functioning in her step-two findings, the ALJ specifically referenced Dr. Ott's assessment of this impairment and found his report persuasive when formulating Dubois's RFC. (ECF No. 9, p. 22). She further considered evidence that Dubois had been in special education classes, albeit largely due to behavioral issues, that he had ADHD, poor math skills, and that intelligence testing performed in his school years yielded full-scale IQ scores between 80 and 90.[8] (*Id.*, pp. 16, 19, 20, 22). The ALJ also performed the psychiatric review technique, and she considered the relevant Listing, 12.11. (*Id.*, pp. 17-18). As the undersigned has noted, an ALJ's "failure to find an impairment severe at step two may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe." *Summers*, 2023 WL 2707442, at 6 (quotation omitted). In this case, the ALJ did just that. Accordingly, any error in failing to consider borderline intellectual functioning severe at step two was harmless.

---

[8] This stated IQ range appears to contain a typographical error, as the source cited by the ALJ— the prior decision from Iowa—states that IQ testing performed between 1975, 1983, and 1986 placed Dubois's full-scale IQ scores at 92, 93, and 85, respectively, for a full-scale IQ score range of 85 to 93. (ECF No. 9, p. 70). The term "borderline intellectual functioning" generally "describes individuals with IQs between 71 and 84." *Byes v. Astrue*, 687 F.3d at 916. And a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in his intellectual functioning. *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001).

## C.      Subjective Complaints

Dubois next contends that the ALJ did not properly evaluate his subjective complaints.  He maintains that the ALJ relied solely on the medical records to discount his complaints that his mental symptoms preclude any type of work, and altogether failed to address any inconsistencies regarding his mental symptoms.  (ECF No. 11, p. 13-17).  When evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  Social Security Ruling ("SSR") 16-3p, "Evaluation of Symptoms in Disability Claims," 2017 WL 5180304, at 4 (Oct. 25, 2017).  In making this assessment, the ALJ must consider several factors, including the claimant's daily activities; the duration, intensity, and frequency of the symptoms; precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; any functional restrictions; the claimant's work history; and the objective medical evidence.  *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008), and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (per curiam)).  *See also* SSR 16-3p, 2017 WL 5180304, at 7-8 (describing several of the above factors, as well as evidence of treatment other than medication that an individual receives); 20 C.F.R. § 416.929(c)(3) (same).  However, "[t]he ALJ is not required to discuss each *Polaski* factor as long as 'he [or she] acknowledges and considers the factors before discounting a claimant's subjective complaints.'"  *Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quoting *Moore*, 572 F.3d at 524)).  While an ALJ is not free to disregard a claimant's subjective complaints merely because the medical evidence does not support them, she "may choose to disbelieve those subjective reports

23

because there are inherent inconsistencies or other circumstances that cause the ALJ to question the reliability of the subjective reports." *Twyford v. Comm'r, Soc. Sec. Admin.*, 929 F.3d 512, 517-518 (8th Cir. 2019).

After review of the ALJ's decision and the entire record, the undersigned finds that the ALJ, consistent with SSR 16-3p and the relevant regulations, conducted an adequate assessment of Dubois's symptomatic complaints, and that the assessment is supported by substantial evidence. At the outset, the undersigned notes that the ALJ did give significant weight to Dubois's subjective complaints of mental-health symptoms. The ALJ included in the RFC several significant non-exertional limitations based on Dubois's mental symptoms, limiting him to simple, routine, repetitive work involving limited interactions with all coworkers and the general public, and limiting the type of supervision that he required to that which is simple, direct, and concrete. (ECF No. 9, p. 18).

To the extent that the ALJ did discount Dubois's subjective complaints, a review of the decision as a whole demonstrates that the ALJ adequately considered several of the relevant factors when evaluating Dubois's complaints. The ALJ expressly cited 20 C.F.R. § 416.929 and SSR 16-3p; discussed Dubois's allegations as contained in his function report, pain questionnaire, hearing testimony, and medical records; and conducted an express analysis of his subjective complaints of pain and of other mental-health symptoms and discussed them elsewhere in the decision as well. (ECF No. 9, pp. 17-21). With regard to Dubois's complaints of mental-health symptoms, the ALJ considered Dubois's reported activities and the inconsistencies in his subjective statements regarding these activities. (*Id.*, p. 17, 18-19, 20). She specifically noted, for example, his complaints of difficulties getting along with people and interacting socially, including in the work setting, but she also noted his statements that he texts, talks on the phone, lives with his spouse,

24

and can be social but prefers to keep social interactions short.  (*Id.*, 17, 19, 242-249).  The ALJ

further considered, and the record shows, that although Dubois cited difficulties with focus,

concentration, completion of tasks, and feeling overwhelmed, he indicated that he had an attention

span of 30 minutes to an hour; that he spends his time watching TV and movies with his wife; is

capable of independent personal care, needing a calendar or reminders from his wife only for

medication and grooming; can eat out, make simple meals, mow the yard, do light household

repairs; goes fishing about once a month with others; and can perform household chores, but

generally does not do so because he feels he is not good at them.[9]  (*Id.*, p. 17, 242-247).

The ALJ also considered the observations of Dubois's various examiners—Nurse Gattis,

Dr. Thomason, and Dr. Ott—who documented largely normal behavior and mental status findings

during their encounters with Dubois, despite his impairments.  (ECF No. 9, p. 19, 22).  Nurse

Gattis documented Dubois's good mental functioning and full orientation during each of her

encounters with him in 2019, 2020, and 2021, despite the mild depression and anxiety she

diagnosed and treated in 2021.  (*Id.*, pp. 19, 346-347, 350, 355-356).  Dr. Thomason also

documented Dubois's congruent mood, normal thoughts, and perceptions, despite some

distractibility and poor insight.  (*Id.*, pp. 19, 319).  And Dr. Ott documented Dubois's ability to

cooperate and relate appropriately during their encounter in June 2021.  (*Id.*, pp. 22, 323).

Consistent with these examiners' observations, the undersigned further notes Dubois's testimony

that his anxiety and irritations with people did not seem to interfere with obtaining medical care

and getting along with medical professionals.  (*Id.*, p. 22, 51).  Further, he told Dr. Ott that he had

---

[9] The undersigned further notes that when asked to describe any changes in his activities since his disability, Dubois stated that he watches TV, movies, and goes fishing "a lot more[.]"  (ECF No. 9, p. 246).

no major conflict with other people, and Dr. Ott described him as generally pleasant, and exhibiting no aggression, though he seemed tense and "uptight." (*Id.*, p. 323, 325-326).

The ALJ also considered her own observations that Dubois was able to testify in response to questioning at the hearing, and to complete his function report and pain questionnaire. (ECF No. 9, p. 22). She further considered the evidence of Dubois's non-compliance with treatment. Specifically, Dubois's only stated goal for initiating therapy with Dr. Thomason in February 2021 was the need to get disability and, for the next 10 months, he did not comply with Dr. Thomason's treatment recommendation to begin taking prescription medication. (*Id.*, pp. 19, 56-57, 318, 340, 344-345). Specifically, on December 28, 2021, he visited his primary care provider, Nurse Gattis, and told her he was supposed to have begun taking citalopram (Celexa) in March 2021 but had not done so, and he obtained a prescription for it that day.[10] (*Id.*, pp. 19, 309, 331, 344-345, 347). The record further indicates that Dubois did not return for therapy with Dr. Thomason until almost a year after his initial visits. (*Id.*, pp. 19, 308-319, 331-341, 344, 370-371, 373-375). *See Whitman*, 762 F.3d at 707-708 (noting ALJ properly considered gaps in claimant's treatment history when considering his claim of debilitating symptoms); *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (failure to maintain consistent treatment pattern for alleged mental impairments is relevant to

---

[10] Dubois contends that the ALJ's decision can be read to suggest that "[e]ither the ALJ or the [opinion] writer" mistakenly thought citalopram and Celexa were different medications and that Dubois had taken Celexa. (ECF No. 11, p. 14). However, Dubois does not dispute that the ALJ found he did not take citalopram prior to December 28, 2021, nor does he dispute the evidence on which the ALJ relied when making that finding—specifically, Nurse Gattis's treatment note documenting Dubois's admission that he had not taken citalopram (Celexa) prior to obtaining the prescription for it on December 28, 2021. (ECF No. 9, pp. 19, 344-345). An arguable deficiency that had no practical effect on the decision is not a sufficient reason to set aside the ALJ's decision. *Hensley*, 829 F.3d at 932.

analysis of subjective complaints); *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995) (that encounters with doctors appear to be linked to quest to obtain benefits, rather than to obtain treatment, is relevant consideration when evaluating subjective complaints).

It is noteworthy that by the time he made the concession of medication non-compliance to Nurse Gattis on December 28, 2021, Dubois had already submitted contradictory statements to the agency, both in his pain questionnaire dated April 2021, which stated that he was taking Celexa, and in his evaluation with Dr. Ott in June 2021, where he stated that he was taking medication that had been prescribed by "Dr. Dana" for depression and anxiety, but he could not recall the name of it.  (ECF No. 9, p. 240, 322).  Dr. Janssen noted the inconsistency in her psychiatric review technique narrative at the agency level, stating that although Dubois claimed to be on mental-health medication, his mental-health treatment provider, who was Dr. Thomason, had indicated Dubois was *not* on medication.  (*Id.*, pp. 98).

Dubois faults the ALJ for relying on his non-compliance, first arguing that she failed to consider whether he was non-compliant due to a lack of health insurance; however, Dubois specifically testified that his health insurance covered the cost of his treatment with Dr. Thomason and that he had transportation to get to his appointments.  (ECF No. 9, pp. 52-53; ECF No. 11, p. 15).  Dubois next likens his case to *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009), and contends the ALJ failed to consider whether his non-compliance was attributable to schizoaffective disorder or other mental illness.  (ECF No. 11, pp. 15-17).  In *Pate-Fires*, the claimant suffered from severe schizoaffective disorder that caused manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and complete denial of her illness.  *Id.*, 564 F.3d at 946.  Further, the evidence "overwhelmingly demonstrate[d] Pate-Fires's noncompliance was attributable to her mental illness[,]" yet the ALJ held her non-compliance was not justified and denied her disability

27

claim.  *Id.*  The Eighth Circuit reversed the decision because the ALJ failed to recognize that Pate-Fires's non-compliance was a manifestation of her schizoaffective disorder.  *Id.* at 945.

Unlike Pate-Fires, Dubois was fully cognizant of his non-compliance, having reported it to his primary care provider and having acknowledged during his testimony that he did not like to see Dr. Thomason and preferred not to do so.  (ECF No. 9, pp. 51-53).  Moreover, as previously discussed, there is no medical evidence in the record that Dubois suffered from a psychotic disorder, such as schizoaffective disorder, as Pate-Fires did.  In fact, the medical evidence of record, which affirmatively documents that Dubois experienced no delusions, hallucinations, or disordered thought processes, is to the contrary, and none of Dubois's examining doctors suggested that any of his mental-health impairments or symptoms rendered him incapable of understanding the implications of his non-compliance.  *Cf. Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2009) (no evidence "expressly linking" depression and noncompliance).

Finally, the ALJ also considered Dubois's complaints that he experienced limitations from pain in several sites throughout his body and sleepiness caused by Celexa.  (ECF No. 9, pp. 19-21).  She found that Dubois's degree of resulting functional limitation from these complaints was consistent with the assessed RFC, observing that Dubois had made inconsistent statements about how long he could walk before needing rest; his medical records evinced no complaints or treatment for the conditions he cited; and they reflected minimal complaints of pain and normal findings as to his range of motion and strength.  (*Id.*, pp. 20-21).  Although Dubois criticizes the ALJ for considering his complaints of pain, contending that the analysis was irrelevant because it related to physical impairments, not mental impairments, the undersigned disagrees that the analysis was irrelevant.  (ECF No. 11, p. 14).  Assessment of a claimant's RFC requires consideration of all impairments and related symptoms, including complaints of pain, and all

evidence, whether medical or nonmedical.  *See* 20 C.F.R. §§ 416.929(c), 416.945(a)(2-3) and (e) (requiring assessment of the "total limiting effects" of all impairments and related symptoms, including pain, based on all the medical and nonmedical evidence).  Further, Dubois associated his pain with both his physical and mental issues.  (ECF No. 9, pp. 239-240).  Consideration of the effects of his pain and his claimed physical impairments, therefore, was both required and relevant to his overarching claim of disability.

The undersigned finds that the ALJ conducted an adequate evaluation of Dubois's claimed symptoms, considered relevant factors, and gave good reasons, supported by substantial evidence, for partially discounting those symptoms.

### D.    RFC Determination

In his final point, Dubois argues that the ALJ's assessment of his mental RFC is not supported by substantial evidence.  The RFC assessment is a determination of the most a claimant can still do despite the physical and mental limitations caused by his impairments and related symptoms.  *See* 20 C.F.R. § 416.945(a).  It is the claimant who bears the burden to demonstrate his RFC.  *Vossen*, 612 F.3d 1011, 1016 (8th Cir. 2010), *cited in Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).  And as a medical question, it must be supported by some medical evidence of the claimant's ability to function in the workplace.  *Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020).  Thus, medical source opinions are considered when assessing a claimant's RFC.  *Id.* However, there is no requirement "that every aspect of an RFC finding 'be supported by specific medical opinion.'"  *Twyford*, 929 F.3d at 518 (quoting *Hensley*, 829 F.3d at 932).  The final determination is left to the Commissioner, and it entails consideration of all relevant evidence, including the medical records, observations of treating physicians and others, and the claimant's own description of his limitations.  *Lawrence*, 970 F.3d at 995.

29

As the previous discussion shows, the ALJ properly considered the relevant medical evidence documenting Dubois's impairments before concluding that he could perform simple, routine, repetitive work involving limited interactions with all coworkers and the general public, and with supervision that is simple, direct, and concrete.  (ECF No. 9, p. 18).  As noted, Dubois established a counseling relationship with Dr. Thomason at River Valley Counseling in early 2021, indicating uncertainty about his goals for counseling, other than the need to get disability.  (*Id*., pp. 19, 56-57, 318, 340).  He cited lifelong symptoms of anger, anxiety, depression, and stress, which he said kept him from working because he would get angry, frustrated, and make people mad, and either quit or get fired.  (*Id.*, pp. 309, 311, 316, 318, 331, 333, 338, 340, 371).  Based on Dubois's reported symptoms and history, Dr. Thomason diagnosed unspecified ADHD, PTSD, anxiety, and depression, and he proposed conservative treatment consisting of acceptance and commitment therapy, cognitive behavioral therapy, and advised Dubois to seek medication from his primary care provider.  (*Id*., pp. 19, 35-36, 308-309, 331, 370-371, 375).  Despite this advice in February 2021, there is no evidence that Dubois engaged in therapy with Dr. Thomason between April 2021 and March 2022, and he did not begin taking medication for his symptoms until sometime after December 28, 2021, when he saw Nurse Gattis.  (*Id.*, pp. 19, 22, 308-319, 331-341, 344-347, 370-371, 373-375).  On that date, Nurse Gattis diagnosed only mild depression and anxiety, prescribed the requested medication—citalopram (Celexa)—and her treatment records reflect normal mental-status exams for Dubois in 2019, 2020, and 2021.  (*Id.*, pp. 19, 344-347, 350, 355-356).  Similarly, in his last documented counseling session with Dr. Thomason in March 2022, Dubois was noted to be fully oriented, and his insight, judgment, behavior, affect, speech, and thoughts were within normal limits; he was reported to be taking his medication as prescribed; his progress was stable, and his prognosis fair, though Dubois reported he was still depressed and isolating most of the

time. (*Id.*, p. 32). Dr. Thomason noted that Dubois had worked on therapeutic skills in that session and would "also work on finding things to keep his mind occupied and work with his hands rather than just sitting around and doing nothing." (*Id.*).

It is true that the ALJ's RFC determination rests on neither Dr. Thomason's statement that it would be "virtually impossible" for Dubois to work, nor Dr. Thomason's "check-the-box" assessment forms completed in 2021 and 2022. (ECF No. 9, pp. 21, 98, 111, 309, 371). The ALJ refused to consider the statement because it did not qualify as a medical opinion under 20 C.F.R. § 416.920b(c)(3), and because Dubois was not compliant with medication at the time the statement was made. (*Id.*, p. 21). *See Wildman v. Astrue*, 596 F.3d at 965-66 ("[N]oncompliance can constitute evidence that is inconsistent with a treating physician's medical opinion."). The ALJ further deemed the "check-the-box" assessments unpersuasive because they were conclusory and not entirely consistent with the medical and other evidence. (*Id.*, pp. 21-22, 329, 368, 344-347, 350, 355-356). The RFC is supported, however, by the treatment notes of Dr. Thomason and Nurse Gattis, as well as the medical opinion and supporting evidence from consultative examiner Dr. Ott, and the prior administrative medical findings of the agency psychological consultants, Dr. Janssen and Dr. Clemens. (*Id.*, pp. 19-22). *See Hensley*, 829 F.3d at 932 (holding medical records prepared by treating medical sources can be sufficient to support an ALJ's RFC findings); *see also Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (affirming RFC determination where ALJ relied on opinion of non-treating, non-examining medical consultant, other medical evidence, and subjective reports of others).

Contrary to Dubois's argument, the ALJ specifically considered both Dr. Ott's opinion that Dubois's capacity to cope with the mental demands of work was deficient and Dr. Ott's related observation that Dubois seemed unable to focus effectively. (ECF No. 9, p. 21, 22). Relative to

Dubois's ability to sustain concentration, persistence, and pace, Dr. Ott observed that Dubois seemed unable to focus effectively but exhibited no limitations in persistence or pace. (*Id.*, pp. 21, 22, 325, 326). And relative to Dubois's cognitive ability to understand and carry out work-like tasks, Dr. Ott observed that Dubois was limited due to his minimal work history and his difficulties in school, as demonstrated by his limited fund of knowledge and poor math skills. (*Id.*, pp. 22, 322-326). The ALJ considered these findings and observations, as well as the consistent findings of the agency psychological consultants, and she properly accounted for them in her assessment by finding Dubois capable of performing unskilled work. (*Id.*, pp. 18, 21). *See Morand v. Berryhill*, No. 4:16-CV-01295-DGK-SSA, 2018 WL 1333978, at 3 (W.D. Mo. Mar. 15, 2018) (limitation to "simple routine tasks" and "simple work-related decisions" properly accounted for moderate difficulties in concentration).

Also contrary to Dubois's argument, Dr. Ott addressed Dubois's behavior relative to the issue of social interaction, and the ALJ's RFC assessment fully accounts for Dubois's abilities to respond to supervision and to interact with coworkers and the general public. As the ALJ noted, Dr. Ott reported Dubois's symptomatic statements concerning his irritable and depressed mood, and his anxiety and difficulty getting along with people in the workplace. (ECF No. 9, pp. 22, 320, 323). However, Dr. Ott further observed that, although stern, tense, and uptight, Dubois was generally pleasant and cooperative during the interview, was able to relate appropriately, was fully oriented, with satisfactory range of affect and no abnormal thought processes or content, and he exhibited no aggression. (*Id.*, pp. 22, 322-323). Similarly, the ALJ observed that Dr. Thomason's counseling records document Dubois's symptomatic complaints of anger, anxiety, and related difficulty dealing with people in the workplace, but these records also document Dr. Thomason's personal observations of Dubois's congruent mood, normal thoughts and perceptions, and his full

orientation.  (*Id.*, pp. 19, 20, 311, 319, 333, 341).  The same is true of Nurse Gattis's treatment records, which reflect Dubois's good mental functioning and full orientation at all documented visits, and a diagnosis of only mild depression and anxiety in 2021.  (*Id.*, pp. 19, 21, 344-347).

Based on the foregoing evidence, as well as the agency consultants' RFC assessments, the ALJ concluded that Dubois was moderately impaired in his ability to respond appropriately to supervision and, consequently, limited supervision to that which is simple, direct, and concrete. Relatedly, the ALJ also concluded that Dubois was moderately limited in the abilities to get along with coworkers, as well as his ability to interact appropriately with the general public. Consequently, the ALJ found he had the capacity for only occasional interaction with any coworkers and with the general public.

The undersigned perceives no inconsistency in the foregoing limitations, and to the extent Dubois perceives one, it is unsupported and too granular to warrant reversal.  The assessment of functional limitations from mental impairments is a complex and highly individualized process. 20 C.F.R. § 416.920a(c)(1).  Harmonizing findings, as the Eighth Circuit requires, means more than a mechanical line-by-line exercise.  *See Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam) (noting the deferential standard of review applicable in disability cases precludes labeling findings as inconsistent if they can be harmonized).  Rather, the Court's task is to determine whether substantial evidence supports the ALJ's findings and determinations, employing the deference that attaches to such a restrictive standard of review.  *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021).

The undersigned concludes that the ALJ properly performed the sequential analysis, and there is substantial evidence in the record to support the determination that Dubois is not disabled within the meaning of the Act.

33

### V.       Conclusion

Based on the foregoing, it is recommended that the ALJ's decision be affirmed, and that Dubois's Complaint (ECF No. 3) be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of July 2024.


/s/  *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE